**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| BOCA RATON POLICE and FIRE FIGHTERS' RETIREMENT SYSTEM,<br><br>Plaintiff,<br><br>v.<br><br>EXXON MOBIL CORPORATION, a New Jersey Corporation,<br><br>Defendant. | Case No. _____<br><br>**VERIFIED SHAREHOLDER COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS AND NEW JERSEY STATE LAWS** |

# TABLE OF CONTENTS

NATURE OF THE ACTION ...................................................................................1

I.  INTRODUCTION ......................................................................................2

II.  JURISDICTION AND VENUE ...............................................................9

III.  PARTIES .................................................................................................10

    A.  Plaintiff ........................................................................................10

    B.  Defendant .....................................................................................10

IV.  THE BOARD HAS A HISTORY OF CONTENTIOUS DISPUTES WITH SHAREHOLDERS ...............................................................................10

    A.  In 2021, the Incumbent Board Loses the Most Expensive Proxy Contest to Date. ...........................................................................11

    B.  In Late 2021, the SEC Enacts the Universal Proxy Rule, and in 2022, the Board Amends Exxon's Bylaws in Response. ..............................14

    C.  In 2023, Investors React Negatively to Exxon's Acquisition of Pioneer. ......................................................................................16

    D.  In 2024, Exxon Goes on the Offensive Against Two Shareholders. ..16

V.  THE BOARD ADOPTS THE AUTOMATIC VOTING PROGRAM .........19

VI.  EXXON PREPACKAGES A NO ACTION LETTER FROM THE SEC. ..23

    A.  Exxon Submits a No Action Letter Request on September 15, 2025, and Receives a Barebones Positive Response the Same Day. .............23

    B.  The Non-Binding No Action Letter Does Not Mean Exxon Complied with the Federal Securities Laws. ...................................................24

VII.  EXXON BEGINS SOLICITING RETAIL INVESTORS IN VIOLATION OF THE SEC RULES. ..................................................................................25

VIII.  PLAINTIFF IS ENTITLED TO INJUNCTIVE RELIEF TO PREVENT THE IMPLEMENTATION OF THE UNLAWFUL AUTOMATIC VOTING PROGRAM. ...................................................................................32

COUNT I................................................................................................................34

COUNT II ..............................................................................................................36

REQUEST FOR RELIEF ......................................................................................37

## NATURE OF THE ACTION

1.      Plaintiff Boca Raton Police and Firefighters' Retirement System ("Plaintiff"), by and through its undersigned counsel, brings the following Verified Complaint (the "Complaint") against Exxon Mobil Corporation ("Exxon" or the "Company").  Plaintiff brings the Complaint to challenge Exxon's violations of (i) numerous federal securities laws; and (ii) the New Jersey statute governing the legal use of voting proxies.

2.      This Complaint's allegations are based on Plaintiff's knowledge as to itself, including personal knowledge concerning its Exxon stock ownership.  As to all other matters, this Complaint's allegations are made on information and belief based on the investigation of counsel, which included a review of Exxon's public filings with the United States Securities and Exchange Commission (the "SEC"), Exxon press releases and other public statements on the Company's website, media reports, and other publicly disclosed information about Exxon.  Plaintiff's investigation into the matters alleged herein is continuing.  Facts relevant to certain of Plaintiff's claims are known only to, or are exclusively within, Defendant's custody or control.  Plaintiff believes substantial additional evidentiary support will exist for the allegations in this Complaint after a reasonable opportunity for discovery.

## I.  **<u>INTRODUCTION</u>**

3.  This action challenges Exxon's unlawful effort to secure a large block of shares to automatically and indefinitely vote in favor of the Board's recommendation for any stockholder vote, including electing directors in contested elections and voting on mergers (the "Automatic Voting Program" or "Program"). Specifically, under the Program, participating shareholders' stock will be voted automatically in accordance with the Board's recommendations on ***all*** issues at ***all*** future shareholder meetings.  The Automatic Voting Program violates federal and New Jersey law.

4.  Crucially, while Exxon has labeled the Automatic Voting Program as a "Retail Voting Program," the point of the Program is ***not*** to enhance shareholder democracy or increase voter engagement.  Instead, the Program creates "sticky" votes to support and entrench Exxon's current Board and vote in line with their recommendations on any stockholder proposal—evident from the fact that the Program ***only*** allows shareholders to vote in accordance with the Board's recommendations.  That is not democracy in any sense.

5.  A functioning voting system requires an informed electorate.  An informed electorate, at a minimum, knows the identities of candidates before voting. Thus, in federal elections in the United States, ballots provide voters with basic information such as the candidates' names, and the offices for which they are

2

running, before voters cast their votes. And to ensure that voters actually make their own decisions, voters must either show up in person at the polls or submit a valid absentee ballot. It is considered voter fraud for members of the electorate to sign blank ballots for someone else to fill out. And voters may not assign future votes to party leaders to cast automatically on their behalf.

6. The shareholder franchise is no different. Regulation 14A and other SEC voting rules, enacted pursuant to Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), require that shareholders receive basic information about director candidates and other voting matters before they cast their votes. These SEC voting rules prohibit corporations from collecting shareholders' votes to be cast automatically. And they prohibit soliciting perpetual proxies.

7. Importantly, Section 14(a) was enacted because "[f]air corporate suffrage is an important right that should attach to every equity security bought on a public exchange." *J.I. Case Co. v. Borak*, 377 U.S. 426, 431 (1964) (citing H.R. Rep. No. 1383, 73rd Cong., 2d Sess., at 13 (1934)). It was intended to "control the conditions under which proxies may be solicited with a view to preventing the recurrence of abuses which . . . [had] frustrated the free exercise of the voting rights of stockholders," and to ensure that each shareholder is informed "of the real nature of the questions for which authority to cast his vote is sought." *Id.* (citing H.R. Rep. No. 1383, at 14; S. Rep. No. 792, 73rd Cong., 2d Sess., at 12 (1934)).

3

8.      In recent years, Exxon's shareholders have become increasingly dissatisfied with the Board's and management's poor business decisions and aggressive approach to dissident shareholders:

- In 2021, shareholders elected three dissident shareholders over the incumbent Board's resistance.[1]

- In late 2021, the SEC passed the "Universal Proxy Rule," which made it easier for shareholders to present dissident slates and proposals.[2]

- In 2023, Exxon's stock price dropped by more than 4% upon announcement that Exxon was acquiring Pioneer Natural Resources Company ("Pioneer") for almost $60 billion.[3]

- In connection with the 2024 annual shareholder meeting, Exxon sued two shareholders to prevent them from presenting a proposal.  Exxon continued to litigate against the shareholders, even after they agreed to drop their proposal.  The Company's aggressive litigation tactics cost Exxon further credibility and led to a "no" vote for several Exxon directors.[4]

9.      Fed up with what Exxon described as a "flawed" SEC-established voting system that made it too easy for dissidents to oppose the incumbents, Exxon took matters into its own hands.

10.     In 2025, Exxon commenced the Automatic Voting Program by which shareholders could give their votes to the Board indefinitely.  Under the Program, if

---

[1] *See infra* § IV.A.

[2] *See infra* § IV.B.

[3] *See infra* § IV.C.

[4] *See infra* § IV.D.

Exxon convinces shareholders to make a one-time decision to join, the shareholders' stock will automatically vote in accordance with the Board's recommendations on all issues at all future shareholder meetings.

11.    The Automatic Voting Program never expires, so program shares will continue to vote for the Board's recommendations decades in the future.[5]  This unprecedented perpetual proxy is extraordinarily broad.  It includes contested director elections at annual shareholder meetings and votes to approve mergers at special shareholder meetings.  And it includes votes—for directors who have yet to be identified, much less disclosed to shareholders—to fill additional Board seats that are created in the future.

12.    The Automatic Voting Program purportedly permits shareholders to opt out of the program or override the default vote.  But that right is illusory. Shareholders that have previously declined to vote, once enlisted in the Program, are unlikely to make further effort to manually override the Board's default vote or manually opt out of the program.  Thus, the Program entrenches the incumbent directors by giving them a perpetual proxy over the Program shares at every shareholder meeting.  That is the whole point.[6]

---

[5] *See infra* § V.
[6] *See infra* § V.

13.    Exxon markets the Automatic Voting Program as applying to "retail" shareholders.  But, according to Exxon's SEC filings, the Program is broadly open to everyone except investment advisers under the Investment Advisers Act of 1940—and only because New York Stock Exchange ("NYSE") Rule 452 prohibits them from voting on non-routine matters such as director elections and mergers without client direction.

14.    Notably, Exxon previously asserted that "automatic submissions" of votes "undermine shareholder engagement efforts" and "short-circuit the shareholder engagement process"[7]—yet that is precisely what the Automatic Voting Program seeks to accomplish.

15.    Exxon also knew its Automatic Voting Program was illegal under federal law.  Thus, on September 15, 2025, Exxon requested and received a "no action" letter from the SEC, which stated that the reviewing SEC staff would not recommend an enforcement action against the Program under the two SEC rules Exxon identified, Rule 14a-4(d)(2) and Rule 14a-4(d)(3) (the "No Action Letter").

---

[7] Letter from Neil Hansen (Exxon Vice President, Investor Relations and Secretary) to Vanessa Countryman (Secretary, U.S. Securities and Exchange Commission) (Feb. 3, 2020), https://www.sec.gov/comments/s7-22-19/s72219-6742834-207796.pdf.

6

16.     Exxon received the No Action Letter the day it requested it, which indicates that the No Action Letter was prepackaged.[8]  Indeed, Exxon recently admitted that before requesting the No Action Letter, it spent "years" developing the Automatic Voting Program and engaged in "months" of correspondence with the SEC.[9]

17.     Notably, Exxon omitted clearly relevant SEC rules from its no action letter request.  Exxon apparently understood that the SEC would not grant a no action letter with respect to those rules.  In any event, the No Action Letter is not binding on the SEC, let alone this Court, with respect to any SEC rule.[10]

18.     Exxon quickly moved to implement the Automatic Voting Program after receiving the No Action Letter.  On September 17, 2025, only two days after receiving the No Action Letter, Exxon publicly filed proxy materials related to the Automatic Voting Program.  By mid-October 2025, individual shareholders began receiving "invitations" to opt into the plan.[11]

19.     The Automatic Voting Program violates numerous SEC rules.[12]

---

[8] *See infra* § VI.A.

[9] *City of Hollywood Police Officers' Retirement System v. Woods, et al.*, Case No. 3:25-cv-16633-ZNQ-TJB (D.N.J.), ECF 27.

[10] *See infra* § VI.B.

[11] *See infra* § VII.

[12] *See infra* Count I.

20.     The Automatic Voting Program also violates the New Jersey statute governing proxies.[13]

21.     In this action, Plaintiff seeks preliminary and permanent injunctive relief to prevent Exxon from continuing to implement the unlawful Automatic Voting Program.  The Court is not required to wait until an unlawful election occurs.

22.     The Automatic Voting Program directly infringes on Plaintiff's voting rights because its illegality taints every election while the Program is in effect.  Plaintiff is entitled to vote in elections that are not tainted by Exxon's violations of the SEC rules and New Jersey law.  And the Program is currently harming Plaintiff because the Board is actively creating a large block of perpetual automatic votes in the incumbents' favor.  This block materially dilutes—and materially devalues—the votes of all shareholders that actively participate in the shareholder franchise, including Plaintiff.  The Program also entrenches incumbents and thus reduces shareholder value.  And it creates a chilling effect on dissent board slates and proposals.  Accordingly, Plaintiff's claims are ripe.[14]

23.     Plaintiff also seeks damages.[15]

---

[13] *See infra* Count II.

[14] *See infra* § VIII.

[15] *See infra* Request for Relief.

8

## II.    JURISDICTION AND VENUE

24.    Count I arises under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and the SEC's implementing rules thereunder, 17 C.F.R. § 240.14a-1 *et seq.* This Court has subject matter jurisdiction over this claim under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States of America.  In connection with the acts and conduct alleged in this Complaint, Exxon directly or indirectly used the means and instrumentalities of interstate commerce, including U.S. mail, interstate telephone and other electronic communications, and the facilities of the NYSE, a national securities exchange.

25.    Count II arises under New Jersey law.  This Court has diversity jurisdiction over this claim under 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000 and this action is between citizens of different States.  This Court also has ancillary jurisdiction over this claim under 28 U.S.C. § 1367 because it forms the same case or controversy under Article III of the United States Constitution as Plaintiff's federal claim.

26.    Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa(c), and 28 U.S.C. § 1391(b) because Exxon is incorporated in this District and many of the alleged violations of federal and state law took place within this District.

### III.    PARTIES

#### A.    PLAINTIFF

27.    Boca Raton Police and Fire Fighters' Retirement System (previously defined as "Plaintiff") has been a beneficial owner of Exxon common stock since at least March 2022.  As of November 18, 2025, Plaintiff owned 7,334 Exxon shares with a market value of approximately $862,625.

#### B.    DEFENDANT

28.    Defendant Exxon Mobil Corporation (previously defined as "Exxon" or the "Company") is a New Jersey corporation.  Since July 2023, Exxon's global headquarters has been at 22777 Springwoods Village Parkway, Spring, Texas 77389-1425.  Exxon's common stock trades on the NYSE under the ticker symbol "XOM."  Exxon is involved in the exploration for, and production of, crude oil and natural gas; and the manufacture, trade, transport, and sale of crude oil, natural gas, petroleum products, petrochemicals, and a wide variety of specialty products.

### IV.    THE BOARD HAS A HISTORY OF CONTENTIOUS DISPUTES WITH SHAREHOLDERS.

29.    As late as 2013, Exxon was the most valuable company in the world.[16]  In mid-2014, Exxon's market capitalization peaked at $446 billion.[17]  However, by

---

[16] Matt Egan, *Exxon was the world's largest company in 2013. Now it's being kicked out of the Dow*, CNN (Aug. 25, 2020), https://edition.cnn.com/2020/08/25/investing/exxon-stock-dow-oil.
[17] *Id.*

mid-2020, Exxon's market capitalization had plummeted by $267 billion.[18] Exxon reported a net annual loss of $22.4 billion in 2020.[19] The COVID-19 pandemic decimated energy prices and led the Company to a $20 billion write-down of the value of its shale gas properties.[20]

30.     Exxon was more exposed than its peers to the effects of the pandemic due to poor strategic choices. In 2009, Exxon paid $41 billion to buy natural gas company XTO Energy shortly before natural gas prices plummeted.[21] Exxon was also late to the shale oil boom in the United States.[22] Exxon rival Chevron suffered in the pandemic but not as badly as Exxon. Exxon was removed from the Dow Jones Industrial Average in 2020, while Chevron remained.[23]

A.     **IN 2021, THE INCUMBENT BOARD LOSES THE MOST EXPENSIVE PROXY CONTEST TO DATE.**

31.     Exxon's poor performance understandably led to shareholder dissatisfaction. On December 7, 2020, activist fund Engine No. 1 sent a letter to the

---

[18] *Id.*

[19] Jennifer Hill, *Pandemic pushes Exxon to historic annual loss, $20 bln cut in shale value*, REUTERS (Feb. 2, 2021), https://www.reuters.com/business/energy/pandemic-pushes-exxon-historic-annual-loss-20-bln-cut-shale-value-2021-02-02/.

[20] *Id.*

[21] Matt Egan, *Exxon was the world's largest company in 2013. Now it's being kicked out of the Dow*, CNN (Aug. 25, 2020), https://edition.cnn.com/2020/08/25/investing/exxon-stock-dow-oil.

[22] *Id.*

[23] *Id.*

Board that, among other things, called for Board refreshment with qualified, independent directors with diverse track records of success in the energy sector.[24] On December 18, 2020, Engine No. 1 requested a director questionnaire and nomination forms to prepare to submit director nominations for Exxon's 2021 annual shareholder meeting.[25]

32.    Over the next month, Exxon tried to convince Engine No. 1 not to nominate director candidates.  Exxon directors, officers, and advisors met with Engine No. 1 several times in December 2020 and January 2021.  The Company offered to give Engine No. 1 "some credit for" certain "announcements that the Company intended to make on the Company's upcoming quarterly earnings call[.]"[26]  The incumbent Board selected and appointed three new directors, two of whom (Michael Angelakis and Jeffrey Ubben) remain on the Board to this day.  But the incumbent Board was unwilling to even consider Engine No. 1's proposed director nominees.  On January 27, 2021, Engine No. 1 submitted its notice to nominate four candidates.[27]

33.    The nomination notice led to a contentious proxy contest.  Exxon disclosed that it planned to spend $35 million more than its usual proxy solicitation

---

[24] Exxon Mobil Corp., Proxy Statement (Schedule DEFC 14A) at 4 (Mar. 15, 2021).
[25] *Id.*
[26] *Id.*
[27] *Id.*

costs opposing the dissident slate.[28]  Some industry experts speculated that Exxon actually spent more than $100 million.[29]  According to one report, Engine No. 1 and its allies spent $30 million on the proxy contest—making it the most expensive proxy fight in history to that point.[30]

34.    Independent proxy advisor Institutional Shareholder Services ("ISS") endorsed three of Engine No. 1's four nominees.  Independent proxy advisor Glass Lewis & Co. ("Glass Lewis") endorsed two of the four.[31]  Exxon's three largest investors—The Vanguard Group ("Vanguard"), BlackRock, Inc. ("BlackRock"), and State Street Corporation ("State Street")—voted for Engine No. 1's nominees.[32]

---

[28] Svea Herbst-Bayliss, *Little Engine No. 1 beat Exxon with just $12.5 mln – sources*, REUTERS (June 29, 2021), https://www.reuters.com/business/little-engine-no-1-beat-exxon-with-just-125-mln-sources-2021-06-29/.

[29] *Id.*

[30] *See* Nell Minow, *Memo to Corporate Directors: Three Lessons from the Exxon-Mobil Activist Victory*, HARVARD LAW SCHOOL FORUM ON CORPORATE GOVERNANCE (May 20, 2021), https://corpgov.law.harvard.edu/2021/05/30/memo-to-corporate-directors-three-lessons-from-the-exxon-mobil-activist-victory/.  Other reports pegged Engine No. 1's spending at $12.5 million.  Svea Herbst-Bayliss, *Little Engine No. 1 beat Exxon with just $12.5 mln – sources*, REUTERS (June 29, 2021), https://www.reuters.com/business/little-engine-no-1-beat-exxon-with-just-125-mln-sources-2021-06-29/.

[31] *Advisory firm Glass Lewis backs two dissident nominees in Exxon battle*, REUTERS (May 17, 2021), https://www.reuters.com/business/finance/advisory-firm-glass-lewis-backs-two-dissident-nominees-exxon-battle-2021-05-18/.

[32] *See* Andrew Ross Sorkin, *DealBook*, NEW YORK TIMES (May 31, 2023), https://www.nytimes.com/2023/05/31/business/dealbook/engine-no-1-exxon-mobil.html (noting that Vanguard, BlackRock, and State Street voted for Engine No. 1's nominees); Exxon Mobil Corp., Proxy Statement (Schedule DEFC 14A) at 35 (Mar. 16, 2021) (listing those shareholders as Exxon's three largest).

Other major institutional investors also supported Engine No. 1's nominees, including the California State Teachers' Retirement System ("CalSTRS"), the Church of England, and the New York State Common Retirement Fund.

35.    On May 26, 2021, Exxon shareholders elected three of the four nominees on Engine No. 1's slate.[33]  The winning dissident nominees were: (i) Kaisa Hietala; (ii) Gregory J. Goff; and (iii) Alexander A. Karsner.  Two of those nominees—Hietala and Karsner—are still on the Board.

**B.    IN LATE 2021, THE SEC ENACTS THE UNIVERSAL PROXY RULE, AND IN 2022, THE BOARD AMENDS EXXON'S BYLAWS IN RESPONSE.**

36.    On November 17, 2021, the SEC enacted the Universal Proxy Rule (Rule 14a-19).  The new rule added disclosure requirements onto Rule 14a-4(d), which was specifically "promulgated to eliminate a practice of soliciting proxies for the election of directors without making disclosure of the persons who would be nominated and for whom the proxies would be voted."[34]

37.    Rule 14a-4(d) has four subsections and provides:

(d) No proxy shall confer authority:

(1) To vote for the election of any person to any office for which a bona fide nominee is not named in the proxy statement[;]

. . .

---

[33] Exxon Mobil Corp., Amended Current Report (Form 8-K/A) at 3 (June 21, 2021).

[34] *Aegis Corp. v. Goldman*, 523 F. Supp. 1273, 1279 (S.D.N.Y. 1981).

14

(2) To vote at any annual meeting other than the next annual meeting (or any adjournment thereof) to be held after the date on which the proxy statement and form of proxy are first sent or given to security holders;

(3) To vote with respect to more than one meeting (and any adjournment thereof) or more than one consent solicitation; or

(4) To consent to or authorize any action other than the action proposed to be taken in the proxy statement, or matters referred to in paragraph (c) of this section.[35]

38.     The Universal Proxy Rule requires further disclosures to level the playing field between an incumbent director slate and a dissident's slate. For example, prior to the new rule, a company could send shareholders a proxy and exclude the dissident slate. Under Rule 14a-19, the company must disclose the names of its proposed slate, disclose the names of the dissident's slate, and comply with numerous formatting rules to ensure the company's slate is not portrayed more favorably. Moreover, under the new rule, the proxy must "[p]rovide a means for the security holder to grant authority to vote for the nominees set forth."[36]

39.     On October 25, 2022, the Board amended Exxon's bylaws specifically to address proxy access issues, including with respect to "Rule 14a-19 promulgated under the Exchange Act."[37] The amended bylaws required the Company to disclose

---

[35] 17 C.F.R. § 240.14a-4(d)(4).

[36] 17 C.F.R. § 240.14a-19(e)(2).

[37] Ex. A, art. 9, § (a)(iii)(C)(2).

15

the information required by the Universal Proxy Rule and repeatedly noted the shareholders' responsibility to abide by all relevant laws, including "Section 14 of the Securities Exchange Act of 1934 (together with the rules and regulations promulgated thereunder)[.]"[38]

### C. IN 2023, INVESTORS REACT NEGATIVELY TO EXXON'S ACQUISITION OF PIONEER.

40.    In October 2023, Exxon announced that it was acquiring Pioneer in an all-stock transaction valued at approximately $59.5 billion.[39]  The deal required Exxon to issue approximately 540 million shares to Pioneer shareholders, which diluted Exxon's existing shareholders by approximately 14%.[40]    Exxon's shareholders reacted negatively to the announcement, and the stock dropped by more than 4%.[41]

### D. IN 2024, EXXON GOES ON THE OFFENSIVE AGAINST TWO SHAREHOLDERS.

41.    In advance of Exxon's 2024 annual shareholder meeting, Arjuna Capital, LLC ("Arjuna") submitted a proposal for consideration requiring Exxon to

---

[38] *Id.*, art. 8, § (a)(i)(C).

[39] Steve Anderson, *Pioneer Deal Sends Exxon Mobil (NYSE:XOM) Sliding,* TIPRANKS (Oct. 11, 2023), https://www.tipranks.com/news/pioneer-deals-completion-sends-exxon-mobil-nysexom-sliding.

[40] *Id.*

[41] *Id.*

accelerate the pace of reductions in greenhouse gas emissions.  The next day, Follow This ("FT") joined the proposal as a co-filer.

42.   On January 21, 2024, Exxon sued Arjuna and FT in the United States District Court for the Northern District of Texas (the "Texas Federal Court").  In its complaint, Exxon criticized the existing proxy laws and regulations as creating "a flawed shareholder proposal and proxy voting process that does not serve investors' interests[.]"[42]

43.   Arjuna and FT withdrew their proposal in response to Exxon's lawsuit, but Exxon insisted on continuing to litigate.  The Texas Federal Court dismissed the case against FT for lack of personal jurisdiction, and it ultimately dismissed the case completely after Arjuna committed to not bring any other related proposals.

44.   Exxon's aggressive stance in suing its own shareholders led to a vote-no campaign by some of the Company's highest-profile shareholders.  Glass Lewis endorsed the vote-no campaign against Lead Independent Director Joseph Hooley, explaining that: "The Company's unusual and aggressive tactics in this matter could threaten to deter both investors' willingness to submit and ability to vote on materially relevant issues."[43]  Norway's sovereign wealth fund, one of Exxon's

---

[42] Ex. B ¶ 2.

[43] Michael Watson, *Exxon Determined to Crush Activist Investors, Even Over Opposition from Its Largest Shareholders*, DEMINOR LITIGATION FUNDING (June 12,

largest shareholders, stated that it would vote against the election of one Exxon director.[44]   Other shareholders voted against Chairman Darren Woods and Lead Independent Director Hooley.[45]   Still others, like the California Public Employees' Retirement System ("CalPERS") voted against all Exxon's nominees.[46]   According to CalPERS CEO, Exxon's suit: "threaten[ed] to silence shareholders everywhere."[47]

45.    Although the vote-no campaign did not result in the resignation of any Exxon director, it showed that the Company has "work to do to gain back the trust of its investors after its attacks on the shareholder proposal process."[48]

*          *          *

---

2024),      https://www.deminor.com/en/news-insights/exxon-determined-to-crush-activist-investors-even-over-opposition-from-its-largest-shareholders/.

[44] *Id.*

[45] Ross Kerber & Arunima Kumar, *Top Exxon directors cruise to re-election despite activist opposition*, REUTERS (May 29, 2024), https://www.reuters.com/markets/commodities/exxon-shareholders-re-elect-two-directors-targeted-by-activists-2024-05-29.

[46] *Id.*  CalSTRS also voted against Exxon's director nominees.  *See* Michael Watson, *Exxon Determined to Crush Activist Investors, Even Over Opposition from Its Largest Shareholders*, DEMINOR LITIGATION FUNDING (June 12, 2024), https://www.deminor.com/en/news-insights/exxon-determined-to-crush-activist-investors-even-over-opposition-from-its-largest-shareholders/.

[47] Ross Kerber & Arunima Kumar, *Top Exxon directors cruise to re-election despite activist opposition*, REUTERS (May 29, 2024), https://www.reuters.com/markets/commodities/exxon-shareholders-re-elect-two-directors-targeted-by-activists-2024-05-29.

[48] *Id.*

18

46. The facts above demonstrate that shareholder dissatisfaction with the Board and Exxon management is not just a clash between climate activists and those who are more comfortable with the long-term use of fossil fuels. Exxon's fiduciaries have a troubling recent history of poor business choices and disrespect toward the shareholder franchise, which negatively affects all shareholders.

## V. THE BOARD ADOPTS THE AUTOMATIC VOTING PROGRAM.

47. In the course of resisting dissident shareholders, Exxon seized an opportunity to procure automatic votes in support of the Board's preferred agenda.

48. Enter the Automatic Voting Program, which solicits Exxon shareholders to make a one-time choice to cast their votes automatically at *all* future shareholder meetings, including votes at special meetings such as to approve a merger—but *only* in accordance with the Board's recommendations.[49]

49. The Automatic Voting Program is a powerful entrenchment device for Exxon's Board. Although shareholders can purportedly override the automatic default votes under the Program, they are unlikely to do so, similar to individuals who forget to cancel a television subscription that auto-renews. The whole point of the Program is to target shareholders who have not consistently participated in the corporate voting process, then capitalize on the fact that—once enrolled in the

---

[49] As explained below, the Automatic Voting Program is currently operative. *See infra* § VII.

19

program—they are unlikely to spend further time and effort to manually withdraw or manually vote against the Board.

50.    The Board developed and approved the Automatic Voting Program against a backdrop of contentious disputes with shareholders.  This background shows that the Program is not an innocuous attempt to give retail shareholders a greater voice or enhance corporate democracy.  Instead, it is a naked entrenchment device—evident from the fact that it *only* allows shareholders to vote in accordance with the Board's recommendations.

51.    The entrenching effect of the Automatic Voting Program is especially potent at Exxon.  Exxon tends to have a more elderly retail shareholder base, who hold the stock for its dividend.  Exxon's individual shareholders routinely pass away while holding the stock.  Participants in the Program lock up the votes associated with their shares not only during their own lifetimes, but also while the shares are in probate, and until their heirs opt out of the program.  Because heirs are unlikely to know that the shares are involved in the program, the shares might be voted automatically for years after the heirs inherit them.  The program materials Plaintiff has seen to date do not highlight this risk.

52.    Exxon has also resorted to misleading statements to market the Automatic Voting Program, stating that the "average retail investor would have had to dedicate a year of full-time work to briefly study and vote on each of the roughly

20

28,000 items in the proxies of the companies in the Russell 3000 in 2024—and that's assuming that they spent only 5 minutes on each item."[50]  As a commentator pointed out, Exxon's claim of the time needed for proxy voting is "misleading" because the average retail shareholder likely owns eight or fewer stocks—not 3,000.[51]

53.    The extreme nature of the Automatic Voting Program is manifest when compared to the rules that apply to brokers.  Since July 2009, the NYSE rules have prevented stockbrokers from voting their clients' stock without client instructions, even in non-contested elections.[52]  "The amendments respond[ed] in part to criticism of the NYSE by institutional shareholders and shareholder activist groups that the allowance of broker discretionary voting in director elections . . . had the effect of diluting 'just vote no' campaigns and other efforts to marshal opposition votes to incumbent directors that fell short of a full-blown proxy contest."[53]  So while the NYSE rules require specific client instructions for every vote, even uncontested

---

[50] ExxonMobil Investors: *Your shares, your say: ensuring retail investors are heard* (Sep.      15,      2025),https://corporate.exxonmobil.com/news/news-releases/2025/0915_ensuring-retail-investors-are-heard

[51] Amy C. Arnott, *Dear Exxon Mobil: No Thank You*, Morningstar (Sep. 30, 2025), https://www.morningstar.com/stocks/dear-exxon-mobil-no-thank-you.

[52] *See* Knute J. Salhus & Jeffries L. Oliver-Li, *SEC Approves Elimination of Broker Discretionary Voting in Uncontested Elections of Directors*, WILMER HALE (July 2, 2009),           https://www.wilmerhale.com/en/insights/publications/sec-approves-elimination-of-broker-discretionary-voting-in-uncontested-elections-of-directors-july-2-2009.

[53] *Id.*

director elections, the Automatic Voting Program purports to permit the Board to vote shares automatically and indefinitely with no specific client instructions.

54.    Importantly, the Automatic Voting Program is not limited to activist proposals on capping greenhouse gas emissions. If Exxon sought to address that issue, there are narrower proposals it could present, including submitting it to a shareholder vote.  Instead, the program permits shareholders to give their votes to the Board on all matters to be voted on at annual or special shareholder meetings, including mergers and contested director elections.

55.    Exxon's own prior statements underscore why the Automatic Voting Program is improper.  In a 2020 letter to the SEC, Exxon complained about alleged "automatic" voting by institutional investors based on proxy advisor recommendations, writing that "[a]utomatic submissions undermine shareholder engagement efforts" and "short-circuit the shareholder engagement process."[54]  Of course, Exxon itself is now trying to "short-circuit" the normal "shareholder engagement process" by securing a block of votes to be voted perpetually and automatically in accordance with the Board's recommendations.

---

[54] Letter from Neil Hansen (Exxon Vice President, Investor Relations and Secretary) to Vanessa Countryman (Secretary, U.S. Securities and Exchange Commission) (Feb. 3, 2020), https://www.sec.gov/comments/s7-22-19/s72219-6742834-207796.pdf.

56.     In its 2020 letter to the SEC, Exxon even proposed that for contested elections, votes should be "pre-populated at 'ABSTAINED' or 'DO NOT VOTE' until the client determines to affirmatively vote them."  Now, Exxon is doing the opposite:  under the Automatic Voting Program, votes on contested issues will be cast automatically in favor of the Board.

## VI.    EXXON PREPACKAGES A NO ACTION LETTER FROM THE SEC.

### A.     EXXON SUBMITS A NO ACTION LETTER REQUEST ON SEPTEMBER 15, 2025, AND RECEIVES A BAREBONES POSITIVE RESPONSE THE SAME DAY.

57.     Exxon was clearly aware that the Automatic Voting Program violated federal law.  On September 15, 2025, Exxon requested a "no action" letter from the SEC[55] with respect to Rule 14a-4(d)(2) and Rule 14a-4(d)(3), which, among other things, prohibit proxies for multiple shareholder meetings.[56]  Notably, Exxon's no action letter request did not address other directly relevant SEC rules.[57]

58.     Exxon received the No Action Letter *the same day*.[58]  The No Action Letter was short.  It regurgitated certain of the representations in Exxon's no-action letter request, and then informed Exxon that the SEC Division of Corporate Finance would not recommend an enforcement action against the Automatic Voting Program

---

[55] *See* Ex. C.

[56] *See supra* ¶ 37.

[57] *See infra* §VII.

[58] *See* Ex. D.

23

for violating Rule 14a-4(d)(2) and Rule 14a-4(d)(3). The almost immediate turnaround of Exxon's request implies that Exxon negotiated with the SEC staff before submitting its request and tailored its request to what the SEC staff was willing to include in the No Action Letter. Indeed, Exxon admittedly engaged in "months" of correspondence with the SEC before requesting the No Action Letter.[59]

### B.   THE NON-BINDING NO ACTION LETTER DOES NOT MEAN EXXON COMPLIED WITH THE FEDERAL SECURITIES LAWS.

59.   A no action letter is a non-binding statement by SEC staff about whether they would recommend an enforcement action against a company for a proposed plan of conduct. A no action letter does not bind the SEC, which is free to bring an enforcement action if a company moves forward with the proposed conduct. Nor is a no action letter binding on a court in a civil action.[60]

60.   Exxon recognizes this. In the Company's 2024 complaint against the two shareholders, Exxon affirmatively argued that SEC interpretive guidance did not bind the Texas Federal Court.[61] There, Exxon asserted:

> The plain language of Rule 14a-8 supports excluding the
> 2024 Proposal, but current guidance by SEC staff about

---

[59] *City of Hollywood Police Officers' Retirement System v. Woods, et al.*, Case No. 3:25-cv-16633-ZNQ-TJB (D.N.J.), ECF 27.

[60] *See, e.g.*, *Trinity Wall St. v. Wal-Mart Stores, Inc.*, 792 F.3d 323, 331 (3d Cir. 2015) (recognizing that "no-action letters are not binding—they reflect only informal views of the staff and are not decisions on the merits"); *N.Y.C. Emps.' Ret. Sys. v. SEC*, 45 F.3d 7, 12 (2d Cir. 1995) ("No-action letters are deemed interpretive because they do not impose or fix a legal relationship upon any of the parties.").

[61] Ex. B ¶¶ 18, 42, 61.

> how to apply the rule can be at odds with the rule itself. Even though that guidance has no legal force or effect, Defendants and other similar activist organizations rely on it to pursue their personal preferences at the expense of shareholders. ExxonMobil seeks declaratory relief from this Court to stop this misuse of the current system.[62]

In other words, Exxon told the Texas Federal Court that the SEC staff's positions on SEC rules were not dispositive. The court had to interpret the rules themselves.

61. Here, the No Action Letter is non-binding with respect to the two SEC rules it addresses. The No Action Letter itself states that it "does not express any legal conclusion on the questions presented or any views on any other questions that your request may raise, including compliance with other provisions of the federal proxy rules or the federal securities laws." And the No Action Letter fails to address several other SEC rules relevant to the Automatic Voting Program (discussed below).

## VII. <u>EXXON BEGINS SOLICITING RETAIL INVESTORS IN VIOLATION OF THE SEC RULES.</u>

62. On September 17, 2025, Exxon filed copies of communications to shareholders soliciting participation in the Automatic Voting Program (the "Solicitation Materials"). Exxon filed the Solicitation Materials as definitive proxy materials on Schedule DEFA 14A.[63]

---

[62] *Id.* ¶ 18.

[63] Ex. E, Exxon Mobil Corp., Definitive Proxy Statement (Schedule DEFA 14A) (Sep. 17, 2025).

63.    In October 2025, Exxon had brokers forward the Solicitation Materials to shareholders, "inviting" them to join the Automatic Voting Program.  Although Exxon marketed the program as "another way to ensure [the shareholder's] voice is heard," participation in the program would simply make the Board's voice louder.[64]

64.    The Solicitation Materials touted the program as a "new, easy way to vote" and a way to "[s]ave time[.]"[65]  These slogans confirmed that Exxon's goal is to attract support from relatively passive shareholders who will be unlikely to opt out of the program in the future.

65.    According to the Solicitation Materials, "this free service" is available to "[a]ll shareholders, including beneficial owners, registered shareholders, and participants in company-sponsored equity or retirement plans."[66]  The materials do not mention that registered investment advisors may not participate in the plan because NYSE Rule 452 prohibits brokers from voting on non-routine matters without instructions from the ultimate beneficial owner.  The materials also do not explain what happens once a shareholder dies and the new owners do not know that the Board is continuing to vote the shares.

---

[64] Ex. E at 3.

[65] *Id.*

[66] *Id.* at 9.

66.    The Solicitation Materials violated numerous SEC rules pursuant to Regulation 14A.  Specifically:

67.    **Rule 14a-4(d)(1):** This rule prohibits a proxy: "To vote for the election of any person to any office for which a bona fide nominee is not named in the proxy statement[.]"  A "bona fide nominee" must have "consented to being named in a proxy statement relating to the registrant's next annual meeting of shareholders at which directors are to be elected (or a special meeting in lieu of such meeting) and to serve if elected."  The Automatic Voting Program violates this rule because it unlawfully allows perpetual proxies to vote for the elections of directors who are *not* bona fide nominees and *not* named in the proxy statement for the next annual meeting—including for directors who are nominated, and new Board seats that are created, years after the proxy was granted.  Notably, Exxon did not obtain a no action letter with respect to its violation of this rule.

68.    **Rule 14a-4(d)(2):** This rule prohibits a proxy: "To vote at any annual meeting other than the next annual meeting (or any adjournment thereof) to be held after the date on which the proxy statement and form of proxy are first sent or given to security holders."  The Automatic Voting Program violates this rule because it unlawfully allows perpetual proxies to vote at annual meetings far into the future.

69.    **Rule 14a-4(d)(3):** This rule prohibits a proxy: "To vote with respect to more than one meeting (and any adjournment thereof) or more than one consent

27

solicitation." Again, the Automatic Voting Program violates this rule because it unlawfully allows perpetual proxies to vote at annual meetings far into the future.

70. **Rule 14a-4(d)(4):** This rule prohibits a proxy: "To consent to or authorize any action other than the action proposed to be taken in the proxy statement, or matters referred to in paragraph (c) of this section." In other words, the grant of a proxy can only be for matters listed in the proxy statement and not for matters that have not yet been identified. The Automatic Voting Program violates this rule because it unlawfully allows perpetual proxies to vote for actions and matters not listed in the current proxy statement, including votes for new directors and other matters far into the future. Notably, Exxon did not obtain a no action letter with respect to its violation of this rule.

71. **Rules 14a-3(a), 14a-3(b), and 14a-12:** Rule 14a-3(a)(1) prohibits a proxy solicitation "unless each person solicited is concurrently furnished or has previously been furnished with . . . [a] publicly-filed preliminary or definitive proxy statement, in the form and manner described in § 240.14a-16, containing the information specified in Schedule 14A," and various items of "current" information and information for the "last fiscal year." Rule 14a-3(b) prohibits a proxy solicitation unless the proxy statement is "accompanied or preceded by an annual report to security holders," which must include audited financial statements for the "most recent fiscal years." These rules codify the common-sense principle that

28

shareholders must have current, material information before voting.  In violation of these rules, the Automatic Voting Program "invites" shareholders to grant a perpetual proxy.  Notably, Exxon did not obtain a no action letter with respect to its violations of these rules.[67]

72.    **Rule 14a-5:**  Rule 14a-5 addresses the presentation of information in proxy statements.  Rule 14a-5(e) provides that "[a]ll proxy statements shall disclose" the: (i) "deadline for submitting shareholder proposals for inclusion in the registrant's proxy statement and form of proxy for the registrant's next annual meeting"; (ii) "date after which notice of a shareholder proposal submitted outside the processes of § 240.14a–8 is considered untimely"; (iii) "deadline for submitting nominees for inclusion in the registrant's proxy statement"; and (iv) "deadline for providing notice of a solicitation of proxies in support of director nominees other than the registrant's nominees pursuant to § 240.14a-19 [the Universal Proxy Rule][.]"  The Solicitation Materials contain no such information.  Rule 14a-5(b) provides that shareholder authority regarding subjects that "must be determined in the future . . . shall be confined within limits reasonably related to the need for discretionary authority."  The authority Exxon asks shareholders to provide under

---

[67] While Rule 14a-12 permits parties to provide certain information to shareholders before the filing of a preliminary or definitive proxy statement, that rule does not save the Automatic Voting Program, since a proxy solicitation under SEC Rule 14a-12 cannot include a proxy for the shareholder to sign.  The actual grant of the proxy must await the dissemination of the proxy statement.

the Program is boundless and not confined within reasonable limits, and there is no need for discretionary authority.  Notably, Exxon did not obtain a no action letter with respect to its violation of this rule.

73.    **Rule 14a-6:**  Rule 14a-6 addresses the deadlines and requirements for filing proxy materials for various voting matters and transaction types.  The Automatic Voting Program violates this rule because it purports to permit shareholders to give up their votes in perpetuity before receiving any such proxy materials.  Notably, Exxon did not obtain a no action letter with respect to its violation of this rule.

74.    **Rule 14a-9:**  Rule 14a-9(a) provides that:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

75.    The Automatic Voting Program violates this rule because it purports to permit shareholders to give up their votes without receiving *any* information about the specific matters on which the Board will cast their votes.  Notably, Exxon did not obtain a no action letter with respect to its violation of this rule.

30

76.   **Rule 14a-10:**  Rule 14a-10 prohibits: "(a) Any undated or postdated proxy; or (b) Any proxy which provides that it shall be deemed to be dated as of any date subsequent to the date on which it is signed by the security holder."  The Automatic Voting Program violates this rule because it purports to create proxies that are undated and voted on undisclosed dates in the future, long after being signed by the security holder.  Notably, Exxon did not obtain a no action letter with respect to its violation of this rule.

77.   **Rule 14a-12:**  Rule 14a-12 establishes strict requirements for solicitations that precede a proxy statement.  The Solicitation Materials do not meet these requirements because, among other reasons, they purport to seek to have shareholders give up their votes before receiving a definitive proxy statement as required by Rule 14a-12(a)(2).  Notably, Exxon did not obtain a no action letter with respect to its violation of this rule.

78.   **Rule 14a-19:**  Rule 14a-19 requires special disclosures in contested director elections.  Under Rule 14a-19(e), companies and dissidents are now required to use a universal proxy card that lists all the nominees in alphabetical order in the same font and type size.  Companies must also provide a way for shareholders to vote for dissident nominees as part of the companies' proxy materials.  This change makes it easier for dissidents to present their nominees and proposals to the shareholder franchise.  The Automatic Voting Program violates this rule because it

31

purports to allow shareholders to give up their votes in all elections, including disputed director elections, before receiving information about the dissident candidates or a way to vote for the dissident candidates. Notably, Exxon did not obtain a no action letter with respect to its violation of this rule.

## VIII. PLAINTIFF IS ENTITLED TO INJUNCTIVE RELIEF TO PREVENT THE IMPLEMENTATION OF THE UNLAWFUL AUTOMATIC VOTING PROGRAM.

79. The Automatic Voting Program violates federal and state law and rides roughshod over the proper functioning of the shareholder franchise. The unlawful Program will cause irreparable harm to Plaintiff and Exxon's other shareholders, and the equities support preliminary and permanent injunctive relief to stop the implementation of the Program.

80. The Program directly infringes on Plaintiff's voting rights because its illegality taints every election while the Program is in effect. Plaintiff is entitled to vote in elections that comply with the SEC rules and New Jersey law.

81. Further, Exxon's clear purpose in creating the Automatic Voting Program is to give the Board consistent voting control over a large block of Exxon's shares, which (under the terms of the Program) will be voted perpetually and automatically in accordance with the Board's recommendations.

82. This dilutes the votes of Plaintiff and all other shareholders who do not participate in the Program and instead seek to cast their votes separately for each

32

annual meeting based on current, accurate information.[68]  This dilution is significant. For example, if 30% of Exxon's shares are enrolled in the Program, defeating the Board's proposals will require over 71% of the remaining shares to vote against the Board.   And if 50% or more of total shares are enrolled, the Program would effectively guarantee that the Board will prevail.

83.    The Program's dilutive effect and entrenchment of the current Board are value-destructive for Plaintiff and other shareholders.  It is well-established that conflicted blockholders tend to harm shareholder value.[69]  Moreover, while board turnover is important for growing shareholder value, the Automatic Voting Program entrenches the incumbents.[70]   Thus, the Automatic Voting Program threatens imminent economic harm to Plaintiff and Exxon's other shareholders.

84.    Exxon typically holds its annual shareholder meetings in May of each year, with definitive proxy statements issued in March or April.   Under the

---

[68] Votes have value. *See generally, e.g.*, Avner Kalay & Shagun Pant, *The Market Value of the Vote: A Contingent Claims Approach* (Sep. 2009), https://w4.stern.nyu.edu/finance/docs/pdfs/Seminars/093f-kalay.pdf;   Umit   G. Gurun, *Earnings and the Value of Voting Rights* (Apr. 17, 2025), https://onlinelibrary.wiley.com/doi/10.1111/fima.12502. Accordingly, impairments to voting rights negatively affect the value of the stock.

[69] *See, e.g.*, Alex Edmans, *Blockholders & Corporate Governance*, ECGI (Oct. 16, 2018), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2285781 (summarizing ways in which blockholders can harm firm value).

[70] *See, e.g.*, George M. Anderson & David Chun, *How Much Board Turnover Is Best?*, HARVARD BUSINESS REVIEW (Apr. 2014), https://hbr.org/2014/04/how-much-board-turnover-is-best.

Automatic Voting Program, participants' shares will be voted in accordance with the Board's recommendations once the Company files a definitive proxy statement with the SEC and before it is distributed to shareholders.[71]

## COUNT I

### Violation of Exchange Act Section 14(a) and Regulation 14A
### (Against Exxon)

85.   Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

86.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n, authorizes the SEC to make rules and regulations regarding proxy solicitations.  The SEC has exercised that authority in, among other things, Regulation 14A, which appears at 17 C.F.R. § 240.14a-1 *et seq*.  Regulation 14A ensures that shareholders receive important information *before* deciding how to vote at shareholder meetings.  That information includes the names and qualifications of director nominees, executive compensation data, details on shareholder proposals, and corporate governance information.

87.   It is self-evident that shareholders must receive the required information on each voting item *before* they decide how to vote.  Rule 14a-3(a) makes this point explicitly by requiring proxy statements before shareholders may grant voting proxies.  Rule 14a-4(d)(2) and Rule 14a-4(d)(3) confirm the importance

---

[71] *See* Ex. C at 3.

34

of shareholders having current information at the time they vote by prohibiting proxies for votes that occur at anything other than the next shareholder meeting. These rules promote informed votes by guaranteeing that shareholders know what they are being asked to vote for before they vote. For example, before casting their votes, shareholders must have the current proxy statement to know which directors are being nominated, and they must have the corporation's current financial statements to evaluate its performance.

88. The Automatic Voting Program turns these bedrock principles upside down. Instead of shareholders deciding how to cast each vote based on receiving current, material information, shareholders are encouraged to blindly grant their votes to the incumbent Board indefinitely and in advance. Regardless of what happens to the corporation or who is nominated in the future, their shares will automatically back the incumbents.

89. Unsurprisingly, Regulation 14A does not permit this result. The Automatic Voting Program violates at least Rule 14a-3(a) (including as modified by Rule 14a-12); Rule 14a-4(d)(1), Rule 14a-4(d)(2), Rule 14a-4(d)(3), Rule 14a-4(d)(4), Rule 14a-5, Rule 14a-6, Rule 14a-9, Rule 14a-10, Rule 14a-12, and Rule 14a-19. By developing and implementing the Automatic Voting Program, Exxon is liable for the violations of Regulation 14A.

35

90.    The No Action Letter does not change this result.  It is non-binding, even on the SEC.  Furthermore, it expressly does not apply to many of the SEC rules the Automatic Voting Program violates, as detailed above.

91.    Exxon's violations of Section 14(a) and Regulation 14A are impairing Plaintiff's voting rights.  Exxon's violations have also damaged Plaintiff by diluting its votes through unlawful means and devaluing its Exxon shares, including by impairing Plaintiff's voting rights and allowing Exxon to take value-destructive corporate actions that would not be approved absent Exxon's violations.

92.    Plaintiff seeks injunctive relief to prevent and remedy the irreparable harm Exxon's violations of Regulation 14A will inflict on the shareholder franchise.

## COUNT II

### Violation of N.J.S.A. 14A:5-19
### (Against Exxon)

93.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

94.    N.J.S.A. 14A:5-19 provides, in relevant part: "No proxy shall be valid for more than 11 months, unless a longer time is expressly provided therein."  The Automatic Voting Program purports to create an eternal proxy.  To Plaintiff's knowledge, the New Jersey courts have not ruled on whether indefinite proxies are valid.  Other courts interpreting similar statutes have held that purportedly indefinite proxies are invalid and therefore last for only eleven months.  This interpretation is

36

consistent with the language and spirit of N.J.S.A. 14A:5-19. Accordingly, the Automatic Voting Program violates N.J.S.A. 14A:5-19.

95. Exxon's violations of New Jersey law are impairing Plaintiff's voting rights and have also damaged Plaintiff by diluting its votes and devaluing its Exxon shares.

96. Plaintiff seeks injunctive relief to prevent and remedy the irreparable harm the Company's violation of N.J.S.A. 14A:5-19 will inflict on the shareholder franchise.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests judgment in the form of an order or orders:

A. Declaring that the Company violated Section 14(a) of the Exchange Act and the SEC's implementing rules thereunder;

B. Declaring that the Company violated N.J.S.A. 14A:5-19, which defines the legal use of voting proxies under New Jersey law;

C. Temporarily, preliminarily, and permanently enjoining Exxon from implementing the Automatic Voting Program;

D. Awarding damages to Plaintiff;

37

E.      Awarding Plaintiff its reasonable fees and expenses in this Action,

including attorneys' fees and expert fees, and pre- and post-judgment

interest on all out-of-pocket fees and expenses; and

F.      Granting such other and further relief as this Court deems just and

proper.

<div style="float:right">
<u>/s/ Theodore J. Hawkins</u>
</div>

OF COUNSEL:                        Eric T. Kanefsky
                                   (No. 024292002)
Javier Bleichmar                   Theodore J. Hawkins
Nancy Kulesa                       (No. 490632024)
BLEICHMAR FONTI & AULD LLP         CALCAGNI & KANEFSKY, LLP
300 Park Avenue, Suite 1301        1085 Raymond Boulevard
New York, New York 10022           18th Floor
(212) 789-1347                     Newark, New Jersey 07102
jbleichmar@bfalaw.com              (862) 397-1796
                                   eric@ck-litigation.com
                                   thawkins@ck-litigation.com
Derrick B. Farrell
Matthew L. Miller
Robert B. Lackey
BLEICHMAR FONTI & AULD LLP         *Counsel for Plaintiff Boca Raton*
3411 Silverside Road               *Police and Firefighters'*
Baynard Building, Suite 104        *Retirement System*
Wilmington, Delaware 19810
(302) 499-2158
dfarrell@bfalaw.com
mmiller@bfalaw.com
rlackey@bfalaw.com

(*Pro Hac Vice* Motions Forthcoming)

Dated: December 1, 2025

## VERIFICATION
### Boca Raton Police and Fire Fighters' Retirement System

I, Darryl Kingman, do hereby declare:

1.      I am the Chairman of the Boca Raton Police and Fire Fighters' Retirement System (the "System"), which is a beneficial owner of Exxon Mobil Corporation common stock. As the Chairman of the Fund, I have authority to act on its behalf.

2.      I verify that I have reviewed the Complaint (the "Complaint"). As to those allegations of which I have personal knowledge, I believe them to be true; as to those allegations of which I lack personal knowledge, I rely upon my counsel and counsel's investigation, and believe them to be true. Having received a copy of the Complaint and reviewed it with counsel, I authorize its filing.

3.      The System has not received, been promised or offered, and will not accept any form of compensation, directly or indirectly, for prosecuting this action except: (i) such fees, costs, or other payments as the Court expressly approves to be paid to the System; or (ii) reimbursement, by its attorneys, of actual and reasonable out-of-pocket expenditures incurred directly in connection with the prosecution of this action.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 11/25/25

_____
Darryl Kingman, Chairman
Boca Raton Police and Fire Fighters' Retirement System

Sworn and Subscribed before me

This 25th day of November 2025

_____
Notary Public

ESHME I. POTTS
Commission # HH 644648
Expires February 25, 2029

## CERTIFICATION UNDER LOCAL CIVIL RULE 11.2 & 40.1

I hereby certify that, to the best of my knowledge, the matter in controversy is not the subject of any other action currently or previously pending in any court or of any pending arbitration or administrative proceeding, except for the following case, which is a related action: *City of Hollywood Police Officers' Retirement System v. Woods et al.*, No. 3:25-cv-16633 (D.N.J., filed Oct. 14, 2025).

Date: December 1, 2025

           */s/ Theodore J. Hawkins*
           Theodore J. Hawkins

39